FEATHEREDGE RUBBER CO. v. MILLER RUBBER CO. et al.

(District Court, N. D. Ohio, E. D.   June 26, 1917.)

No. 338.

1. PATENTS ☞53—ANTICIPATION—PRIOR USE.
  Where the defendant in an infringement suit relied on the defense of anticipation, he must show that the alleged prior use was more than mere experimentation.

2. PATENTS ☞328—INFRINGEMENT—DISCLOSURE.
  The Willis and Felix patent, No. 1,045,234, for a process for rubber sponges, *held* invalid; the disclosure of the patent not being sufficient to enable one skilled in the art to manufacture sponges with commercial success.

In Equity.   Suit by the Featheredge Rubber Company against the Miller Rubber Company and another.   Decree for defendants.

Fay, Oberlin & Fay, of Cleveland, Ohio, and Brown, Nissen & Sprinkle, of Chicago, Ill. (Frank T. Brown and Arthur L. Sprinkle, both of Chicago, Ill., and Jesse B. Fay, of Cleveland, Ohio, of counsel), for plaintiff.

Melville Church and William F. Hall, both of Washington, D. C., for defendants.

KILLITS, District Judge.   Our work has been too heavy since the submission of this case a few weeks ago to permit an extended analysis to be made by the court before vacation.   We deem it sufficient if we present at least the reasons impelling us to the conclusions reached. Counsel who are directly interested in the case are able to fill in this skeleton memorandum with the detail of fact and law necessary to make it complete.

We do not think the reference to the Forster British patent of 1868 suggests an anticipation of Willis and Felix, and so far as that reference is concerned the defense fails.   It is conceded that nothing practicable came of the Forster invention; the patent joining the crowded limbo of inutile grants.   We feel compelled, from the very illuminating testimony of the witness Weber, to hold that the term "steam heater" does not necessarily or even probably refer to a vulcanizer in which both the pressure and heat of steam are used, and we are inclined to agree with Weber that the context and the result which Forster establishes and was seeking suggest that he had in mind a vulcanizer in which the heat of steam only was used.

Our consideration of the patent in question leads to the conclusion that the crucial step in the process, the step in which, if at all, invention abides, one which distinguishes this process and makes a decided advance in the art, is the curing under steam pressure with a view of thereby preserving intact the walls of the cells formed by the expansion of the blowing material until they can be mechanically ruptured.   We are convinced of the superiority of the product had through mechanically rupturing the cells over that attained by perforation thereof through the escape of expanding gases in the process of curing, and

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

it is altogether in this consideration that we proceed to examine the patent and the defenses interposed.

We are unable to find, either, that the defense of anticipation has been sustained by proof of the manufacture of rubber sponges by the Camp and Faultless people, for the reason that the pressure of steam in the factory at Ashland seems to have been utilized to a very limited extent, if at all, in the process of curing; at any rate, the proof does not support that clarity of judgment necessary to sustain defense of anticipation.

[1] The balance of the first defense, that which depends upon the work done by the Goodrich Company, needs to be considered in connection with the second defense, namely, that there is an insufficient disclosure in the patent to enable one skilled in the art to follow the process. The evidence touching the work done in the Goodrich factory in 1903 leads inevitably to the conclusion, as we view it, that the steps there taken were identically those of the claim (4) of the Willis and Felix grant, treated by counsel herein as typical. The testimony on cross-examination of plaintiff's own witnesses left no doubt of this. Sponges were made by taking a rubber compound, curing it in an open steam vulcanizer under pressure substantially equal to that in the complainant's process, following by a mechanical breaking down through rollers and a trimming substantially identical with complainant's process. Indeed, if it could be established that the visit of patentee Felix to the Goodrich plant on another errand at the time that the sponges were being made in Akron had resulted in his gaining a knowledge of the process then used, it seems that no one could say that it was thereafter open to Felix to claim the process of his patent as his invention.

That the Goodrich people made a physically successful sponge is conclusively established by the testimony, and that it was actively put on the market is likewise clear. We believe that the burden which the defendant carries of proving that this was something more than an experiment, thereafter abandoned by the Goodrich Company, has been amply sustained by the publication in the August, 1903, number of the Rubber World, by the facts that the Goodrich people sent out numerous samples, and solicited and received orders for a large number, and that they had had prepared 6,000 cartons for the product and circular advertising matter therefor. These activities were sufficient to carry the enterprise beyond the stage of experiment into the realm of business, and, if the Goodrich Company had continued thereafter to manufacture sponges by this process, it seems indisputable that complainant would have no case.

Why did the Goodrich Company discontinue the manufacture? Two explanations are offered: One was to the great variety of their products it was a matter of little consequence to add another, which it seems to us is rather insufficient; the other explanation is that given by the president of the company, and is one which gives rise to a curious and rather disturbing conjecture. It is that the waste resulting from the manufacture was so great as to render the work unprofitable. But why the waste? It seems a fair inference that, while they made a practical, marketable sponge, they had not gone far enough in experi-

menting upon the compound to eliminate excessive waste; the evidence leaving us with no other sufficient answer to the question. But they took a compound which answers precisely to the description of the patent specification under consideration. They were extensive users of "raw rubber compound as commonly sold on the market." They made sponge rubber in large quantities for their own use and for other people. In other words, the evidence shows us very clearly that the Goodrich Company, skilled in the art of handling rubber compounded with blowing ingredients and making a rubber product with a cellular structure, followed, step by step, so far as the patent under consideration enlightens one skilled in the art at all as to the essential steps from the first, the process upon which Felix and Willis obtained the patent before us on an application filed four years later. Following by anticipation the disclosure of the Willis and Felix patent, the Goodrich Company failed to make a sponge that was commercially successful, because of excessive waste in manufacture, and this failure of the Goodrich people to make sponges to that degree of commercial success which seemed to them sufficient to justify continuing a product which gave so much promise as to cause them to actually place it upon the market is an answer to the query whether the patent contains a sufficient disclosure of the process.

Why is not the court entirely warranted to assume from the evidence that, equivalently, the Goodrich operatives took "a raw rubber compound as commonly sold on the market," and "first thoroughly worked or mixed" it "in a manner well known," having theretofore "thoroughly impregnated" it "with any of the well-known materials which are adapted to become gaseous upon the application of heat which is commonly applied in curing rubber," and then, after "subjecting the compound to the direct action of steam under pressure, and after permitting the cooling and contraction of the resulting substance," broke "down the walls of the cells formed during the operation of curing, by subjecting it to the crushing action of closely confined rolls"? Who can say that skilled workmen of this great concern, acting in 1903 under the inspiration of the desire of Mr. Work to produce a product that would compete with the Russian sponge, and anxious to add an important product to the manufactures of the company, could have more intelligently followed the process as disclosed by the Willis and Felix patent, had they had the patent before them, than they actually did proceed upon and follow the disclosure of that patent by anticipation?

[2] This view of the transactions in Akron gives a great deal of point to the defense made secondly, that the specifications of the patent are insufficient, in that there is no full disclosure of a workable compound or stock, or of a gas-forming medium, which would produce the results claimed. And the feeling, which a consideration of the experiences in the Goodrich plant occasions, that there is something in this second defense, is emphasized by the trials which witness Cutler, for the plaintiff, made upon compounds commonly sold in the market, and which resulted in many instances in the production of sponges which cannot be said to be merchantable. We are driven, therefore, in contemplation of the activities at Akron and the experiences of Cutler, to

the conclusion that an essential element of the process of making a marketable sponge economically, and consequently with commercial success, is a definite compound, at least definite as to the blowing and moderating materials which add the qualities to the rubber necessary to produce the peculiar required results, and that that element is certainly not disclosed in this patent. Neither Mr. Palmer nor Mr. Cutler could be said to be anything less than a man more than ordinarily skilled in the art. The evidence shows that each of them was compelled to admit in words, or by the logic of experiment, that the character of the compound is decidedly important; that, in the language of Palmer, "it was necessary to possess more of the characteristics of the successful compound than of the unsuccessful." If there is a successful compound, important to be had, as Palmer seems to think, and as Cutler's experience shows, then such is not disclosed in the patent before us, as it should have been.

This does not mean that a compound should have been defined so narrowly that equivalent chemicals and combinations might be used with impunity; but it appears that success inheres, in some considerable measure, in the use in the compound, besides blowing ingredients, of an element or elements which work upon the consistency or native characteristics of the particular rubber stock employed and so modify the mass to be blown that the product desired may be reached. The specifications could and should have been broadly amplified in this particular; a generalization might have been employed which would have broadly protected a step in the process which success demands should be taken, but of which the patent does not speak.

We are forced, therefore, to conclude that the second defense is made, if, indeed, a defense of anticipation is not made, in the testimony relating to the work at Akron, and we are not prepared to say that that defense is insufficient.

We do not deem it profitable to take time with the third defense. Clear proof, of course, would be necessary to establish it, and we cannot say that there is such proof here. Besides, if there is, as we view it, a fatal omission in the disclosures, it would matter little what occasioned the lapse. It is likewise unnecessary to consider the fourth and fifth defenses, except we should say that the proof is not sufficiently conclusive to make the defense of public use or abandonment by patentees, and that we are doubtful that an infringement is established in the testimony.

There would be no doubt as to the question of infringement, were not the character of the compound used so important; for it appears that the important and controlling idea of the alleged invention by complainant's assignors, the idea which in practice brought success in the highest degree, is employed by the defendants, namely, the curing under steam pressure counteracting the pressure of the blowing ingredients. If, however, we may place dependence upon the expert testimony of Dr. Harrison, and there is something persuasive in what he says, and find that there is an important new element specially introduced into the compound used by defendants in the shape of water, whose office is to expand into steam at the proper point for a specially

successful result, and to counteract the steam pressure in the vulcanizer, we are again involved with the important question whether it was not necessary that there should have been a more definite disclosure as to compound. It is certain that the defendants' process comes within the broad lines of the typical claim. It is not so certain, however, that defendants infringe, if we read that claim in connection with the disclosures, and find them insufficient for want of something definite as to the nature of "a successful compound."

Decree may be entered for the defense.